**CONTINUATION IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Jim Feasel, being first duly sworn, hereby depose and state as follows:

<u>INTRODUCTION AND AGENT BACKGROUND</u>

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – six cellular phones which are currently in law enforcement possession – and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) currently assigned to the Grand Rapids District Office. I have been employed by the DEA since 2012. I am a federal law enforcement officer who is empowered to conduct investigations, execute warrants, and make arrests. During my career in the DEA, I have participated in over 50 investigations and search warrants. I have completed Special Agent training at the DEA Academy in Quantico, Virginia. I have been trained in the use of physical, electronic and human intelligence surveillance techniques, counter surveillance techniques, use of firearms, report and affidavit writing, execution of arrest and search warrants, court testimony and financial investigation techniques.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this continuation, there is probable cause to believe that violations of 18 U.S.C. § 2118(d) (conspiracy to commit burglary involving controlled substances and 21 U.S.C. § 846 (conspiracy to distribute controlled substances) have been committed by Keonta ANTHONY, William ANTHONY, Dajohn DAVIS, Donald BEACUHAMP and others. There is also probable cause to search the devices described in Attachment A for evidence of these crimes as further described in Attachment B.

IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5. The property to be searched is more specifically described as (collectively, the SUBJECT PHONES or the SUBJECT DEVICES):

    a. SUBJECT PHONE 1 is a black iPhone with a reflective back and was seized from the front floorboard of a rented 2020 gray Jeep Compass on June 15, 2021;

    b. SUBJECT PHONE 2 is a black iPhone with a silver back and was seized from Dajohn DAVIS on June 15, 2021;

    c. SUBJECT PHONE 3 is a black iPhone with a red back seized from TP on June 15, 2021;

    d. SUBJECT PHONE 4 is an LG Smart Phone with model number LMX320MA seized from a white Chevrolet Cruze on June 15, 2021;

e. SUBJECT PHONE 5 is an iPhone with a tan back seized from a white Chevrolet Cruze on June 15, 2021;

f. SUBJECT PHONE 6 is an iPhone with a gray back seized from Keonta ANTHONY's silver Jeep Cherokee on June 15, 2021.

6. The SUBJECT DEVICES are secured in DEA custody at 330 Ionia Avenue Grand Rapids, MI pending forensic examination.

7. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

PROBABLE CAUSE

*Attempted burglary of Westside Pharmacy*

8. On June 14, 2021, a GPS fixed to a Jeep Compass operated by Dajohn DAVIS showed that at approximately 9:45 PM, DAVIS went to DONALD BEAUCHAMP's home on Inkster Road, Redford, Michigan. He stayed there for approximately three minutes, then went back to his own home, arriving approximately 10:10 PM. The tracker left there again five minutes later and went to White Castle, then KEONTA ANTHONY's home on Riverview Street in Redford, Michigan, at approximately 11:05 PM. At approximately 11:32 PM, he left KEONTA ANTHONY's home and drove west on I-96.

9. Investigators caught up to the Compass on I-94 during the early morning hours on June 15, 2021, and saw that it was driving westbound in

tandem with a Jeep Cherokee registered to KEONTA ANTHONY (WILLIAM ANTHONY's brother).

10. The GPS indicated that the Jeep Compass arrived in the Kalamazoo area at approximately 2:00 AM, and drove past the Woodbridge Pharmacy, stopping in a nearby neighborhood. It left the area at approximately 2:16 AM.

11. The tracker indicated that the Jeep Compass past the Gull Pointe Pharmacy at approximately 3:00 AM and then parked in a housing complex immediately behind the pharmacy for several minutes. The tracker drove past the pharmacy again several more times before leaving the area.

12. At approximately 3:43 AM, the tracker approached the Westside Pharmacy and turned around. At approximately 4:05 AM, a member of the surveillance team observed both Jeeps pull into a Meijer gas station. At that time, the surveillance team observed three black males meet in the parking lot, in close proximity to the Jeep Compass. A few minutes later, one of the black males entered the Jeep Compass and both left at approximately 4:11 AM. After leaving the gas station, the tracker went past the Westside Pharmacy four times, pausing in parking lots and a housing complex that have a direct line of sight to Westside Pharmacy.

13. At approximately 5:20 AM, the Compass parked in the Westside Pharmacy parking lot. Surveillance video from the Westside Pharmacy showed three masked men with crowbars pry open the exterior door to the pharmacy building. There were bars in the interior glass door to the pharmacy that the

burglars were unable to break.

14. The burglars left the building at approximately 5:25 am and the tracker on the Jeep Compass left the parking lot around the same time.

15. At approximately 5:57 AM, Michigan State Police caught up to the Jeep Compass and the Jeep Cherokee travelling north on US-131. Troopers initiated a traffic stop of the Jeep Cherokee, and after a brief attempt to evade marked law enforcement units with activated lights and sirens, the vehicle pulled over to the side of the road.  KEONTA ANTHONY was the driver and sole occupant of the Jeep Cherokee.  Investigators subsequently searched the car and found no crowbars, no garbage bags, and no burglary tools.  Investigators seized SUBJECT PHONE 6 from inside the Jeep Cherokee.

16. As the Jeep Cherokee stopped, the Jeep Compass sped away and marked units followed.  At approximately 6:26 AM, the tracker showed that the Jeep Compass was going approximately 116 miles per hour on I-96.  The Jeep Compass exited the highway onto M-100 (at approximately 115 miles per hour) and eventually ran into a residence on Greenwood Street in Grand Ledge at approximately 6:35 AM.

17. Investigators later searched the Compass and found a yellow crowbar, a long green crowbar, a short green crowbar, several pairs of gloves, three face masks, a roll of garbage bags, and two sets of gym shoes.  These items all appeared consistent with what the burglars wore and used in the

5

Westside Pharmacy surveillance video. SUBJECT PHONE 1 was on the front floorboard.

18. Two witnesses drove past the Jeep Compass shortly before it crashed. Police passed them, then they saw a black man wearing all black with white "shoes" running away from the location of the crash. They reported this to police, who followed their directions and found DAJOHN DAVIS within minutes. DAVIS was wearing all black with white socks and no shoes. Investigators seized SUBJECT PHONE 2 from DAJOHN DAVIS.

19. Police set up a perimeter around the area in Grand Ledge. At approximately 9:30 AM, witnesses reported that they saw two black men in a backyard in or near a dumpster. The two men then got into a white car (a Chevrolet Cruze) that began to drive away but was stopped by police. DONALD BEAUCHAMP was in the backseat on the passenger side; WILLIAM ANTHONY was in the backseat on the driver's side. WILLIAM ANTHONY also initially identified himself to police as "Kewon Anderson."

20. The driver was RL, DONALD BEAUCHAMP's sister-in-law. The front passenger was JB, DONALD BEACUHAMP. And TP was in the backseat with WILLIAM ANTHONY and DONALD BEAUCHAMP; TP was later identified as DONALD BEAUCHAMP's girlfriend. RL told investigators that she was at home in Westland, Michigan with JB and then drove to Grand Ledge to pick up DONALD BEAUCHAMP. Investigators seized SUBJECT PHONE 3 from TP and SUBJECT PHONE 4 and SUBJECT PHONE 5 from the inside of the Chevrolet Cruze.

21. Investigators found a pair of khaki pants under a truck near the dumpster that WILLIAM ANTHONY and DONALD BEAUCHAMP were seen in/near. The pants appear consistent with those worn by one of the burglars.

22. WILLIAM ANTHONY and DONALD BEACHAMP were arrested on unrelated outstanding warrants and transported to the Detroit metropolitan area. That day, WILLIAM ANTHONY called his mother from a recorded phone at the Detroit Detention Center, and told her, "He got pulled over first. . . . Me and D [believed to be DONALD BEAUCHAMP] was in a trash can for an hour and thirty minutes. And then what made it worse…" His mother then told him not to talk about it on the phone. WILLIAM ANTHONY called his mother again the next day and said, "I hope they let me out of here before they try and come get me. . . . It will take them a couple of days to get fingerprints back."

23. Based on my training and experience, I believe that WILLIAM ANTHONY and DONALD BEAUCHAMP were hiding in or near the dumpster to avoid law enforcement and coordinated by telephone to have RL, JB, and TP come to Grand Ledge to drive them home before they were caught.

*Indictment*

24. On or about July 13, 2021, Keonta ANTHONY, William ANTHONY, Dajohn DAVIS, and Donald BEAUCHAMP were indicted in the

Western District of Michigan for conspiring to distribute and possess with intent to distribute controlled substance, in violation of 21 U.S.C. § 846, and conspiring to commit burglary involving controlled substances, in violation of 18 U.S.C. § 2118(d) (1:21-cr-128).

25.  The indictment also alleges that Keonta ANTHONY, William ANTHONY, Dajohn DAVIS, and Donald BEAUCHAMP committed or attempted to commit thirteen pharmacy burglaries between June 2020 and June 2021 in furtherance of the conspiracies.

*Use of cell phones in furtherance of conspiracy*

26.  In addition to possessing the SUBJECT PHONES at and shortly after the time of the most recent attempted burglary, cell phones were an important tool for the conspirators throughout the conspiracy.  Several examples are listed below.

27.  Investigators previously obtained and executed Google "geofence" search warrants.  The returns indicated that WILLIAM ANTHONY possessed a cell phone at and during seven of the pharmacy burglaries cited in the indictment.

28.  Investigators previously seized a cell phone from KEONTA ANTHONY on February 2, 2021.  After obtaining a search warrant to extract and examine its contents, investigators located pictures of pharmaceutical bottles with National Drug Code numbers visible, which confirmed that they were stolen during two of the pharmacy burglaries cited in the indictment – the October 19, 2020, burglary in Minneapolis, Minnesota, and the December 24, 2020, burglary in Georgetown, Kentucky.

29. On September 1, 2020, KEONTA ANTHONY texted DAJOHN DAVIS the address of the Medicine Tree Pharmacy in Mattawan, Michigan. That pharmacy was burglarized later that morning. Cell site data confirmed that KEONTA ANTHONY and DAJOHN DAVIS' phones were in the vicinity of the pharmacy at the time of the burglary.

30. Investigators found text messages on KEONTA ANTHONY's phone in which he discussed distributing the stolen controlled substances.

## TECHNICAL TERMS

31. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other

information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

32. Based on my training, experience, and research, I know that the Device has capabilities that allow it to make and receive incoming calls, text communications, emails, social media alerts, photos and videos, advertising alerts, and other notifications, as well as a digital repository for the collection for such capabilities.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time and can access the internet. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

34. In my training and experience, I know that the SUBJECT DEVICSE have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Drug Enforcement Administration.

35. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information

that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

      b.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      c.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      d.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      e.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about

how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   f. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

  37. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

  38. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.